885 F.2d 1053
 112 Lab.Cas. P 11,453, 11 Employee Benefits Ca 1870
 Arthur M. CHAMBLESS and Mildred H. Chambless,
Plaintiff-Appellants, Cross-Appellees,
v.
MASTERS, MATES & PILOTS PENSION PLAN, Stephen P. Maher,
Administrator of the Masters, Mates & Pilots Pension Plan,
C.J. Bracco, Richard M. Casselberry, Michael Di Prisco, E.
Gras, George Groh, Justin Gross, James R. Hammer, James J.
Hayes, Martin F. Hickey, Charles Jess, Francis E. Kyser,
Charles Landry, Orion A. Larson, Robert J. Lowen, Lloyd
Martin, J. Eric May, David Merritt, Thomas E. Murphy, Henri
L. Nereaux, William Ott, Martin Pecil, Franklin J. Riley,
Jr., William I. Ristine, A.C. Scott, Captain John Smith,
Rupert Soriano, Ernest Swanson, Michael Swayne, Allen
Taylor, Nicholas Telesmanic, Kenneth P. Wenthen, C.E.
Witcomb, in their fiduciary capacity as Trustees of the
Masters, Mates & Pilots Pension Plan, Defendants-Appellees,
Cross-Appellants.
 Nos. 1071, 1223, Dockets 88-7892, 88-7928.
 United States Court of Appeals,
Second Circuit.
 Argued May 9, 1989.
Decided Sept. 12, 1989.
 
 Arthur M. Wisehart, New York City (Russell G. Pelton, Wisehart & Koch, New York City, of counsel), for plaintiffs-appellants.
 Bettina B. Plevan, New York City (Joseph Baumgarten, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for defendants-appellees.
 Before KEARSE, CARDAMONE, and PIERCE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 The litigation that brings this appeal before us began nine years ago in 1980. The case has wended its way into our Court twice before. On this third visit, two over-arching issues are presented: Whether the district court's award of actuarially-adjusted benefits is the equivalent of an award of retroactive benefits, inconsistent with our prior ruling in this case; and, whether the district court abused its discretion in calculating the amount of attorney's fees that plaintiffs' counsel may recover.
 
 
 2
 With respect to the first issue, we earlier ruled that appellant was not entitled to recover retroactive benefits. On remand, the district court awarded appellant actuarially-adjusted benefits, which amounts to exactly the same thing. The attorney's fees issue, attendant upon the benefits suit, has like Frankenstein's monster taken on a life of its own and threatens to become a second major litigation, despite the Supreme Court admonishment against such happening. See Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). This is the sixth opinion to be published in this case; we think it should be the last.
 
 I FACTS
 
 3
 In light of the above, we may safely assume familiarity with the factual background and prior proceedings, and set forth only those facts necessary to identify the parties, the dispute and its procedural posture.
 
 
 4
 The appellant is Arthur M. Chambless, a licensed deck officer in the United States Merchant Marine. He became a member of the International Organization of Masters, Mates & Pilots (union) in 1944. The union negotiated a multi-employer-funded pension plan (Plan) for deck officers working for shipping companies that are signatories to the Plan. The Plan, its administrators, and its trustees are the remaining defendants.
 
 
 5
 Chambless complained that the union hastened the early retirement of its older members by assigning them to low-paying jobs. He sought early retirement from the union in April of 1977 and went to work for a ship that was not owned by a signatory to the Plan. As a result, the union informed him that he was no longer in good standing. Citing newly enacted Plan Amendments 46 and 47, the Plan's administrator notified Chambless that because he continued to work for a non-signatory ship, he had not truly retired, was not entitled to a union pension at that time, and could not receive his pension under the Plan until 1986 when he would be 65 years old.
 
 
 6
 The Plan provides monthly wage-related retirement benefits for employees with service of 30 years or longer equal to the greater of either $470 or 60 percent of pay. Pay is defined by looking to the highest-paying five consecutive years in the 10 years immediately preceding retirement. The Plan therefore informed Chambless that when he retired, his monthly benefit would be $470 per month rather than the approximately $970 per month he would have received if he had been allowed to retire in 1977, when his pension would have been calculated using 1967-77 as base years--the period when his income was at its zenith.
 
 
 7
 The tortuous procedural history of this case began in 1980 when Chambless and his wife as plaintiffs brought suit against defendants, inter alia, the union, the Plan, and Chambless' former employers. Essentially, the complaint alleged that because Chambless had worked for a non-Plan ship, the Plan had discriminatorily forfeited his pension, causing him to receive $470 at age 65 rather than $920 at age 55. Chambless asserted a plethora of claims including violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. Sec. 1001 et seq. (1982) (ERISA), antitrust violations, waiver and estoppel, breach of duty of fair representation, infliction of emotional distress, and breach of fiduciary duty.
 
 
 8
 Many of appellant's claims and several named defendants were dismissed following cross-motions for summary judgment. See Chambless v. Masters, Mates & Pilots Pension Plan, 571 F.Supp. 1430, 1459-60 (S.D.N.Y.1983) (Chambless I ). At trial, several more causes of action were dismissed at the close of plaintiffs' case, leaving only the issue of whether the Plan trustees, in applying Amendment 47 of the Plan, had violated ERISA when they caused Chambless to forfeit his pension until age 65. Ruling that the postponement and reduction of Chambless' benefits was arbitrary and capricious, the district court declared the forfeiture a nullity. It directed the trustees to approve Chambless' application for retirement--once he ceased working in the maritime industry--and to "treat the application as if it had been made in 1977 and grant him a wage related pension based on his 1967-1977 employment record." 602 F.Supp. 904, 913 (S.D.N.Y.1984) (Chambless II ). We affirmed and remanded "for a determination of the benefits which Chambless would have received in 1977." 772 F.2d 1032, 1043 (2d Cir.1985), cert. denied, 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986) (Chambless III ).
 
 
 9
 Chambless' counsel then moved for attorney's fees pursuant to Sec. 502(g) of ERISA, 29 U.S.C. Sec. 1132(g). The district court denied the request on the grounds that plaintiff's "vexatious[ ] and wasteful[ ] litigation strategy" outweighed his success on the ERISA claim. It also denied plaintiff's motions to amend the judgment to state the amount of his benefits. No. 80 Civ. 4258 (RLC) (S.D.N.Y. June 23, 1986). We affirmed the district court's refusal to amend its judgment before the benefits had commenced on the grounds that the motion was premature, but reversed and remanded for the district court to "determine and award a reasonable fee for the time spent on Chambless' vindicated ERISA claim." 815 F.2d 869, 872 (2d Cir.1987) (Chambless IV ). Further, we stated that since Chambless had, on September 1, 1986, begun to receive his benefits, any dispute he might have regarding the amount of his pension was ripe for presentation to the district court "to determine whether Chambless is now receiving benefits in the amount to which he is entitled." Id. at 873.
 
 
 10
 That brings us to the decisions that we now review. As the opinion of the district court with which we disagree is unpublished, we set forth its conclusions in some detail. See Chambless v. Master, Mates & Pilots Pension Plan, No. 80 Civ. 4258, 1988 WL 80170 (S.D.N.Y. July 20, 1988) (Carter, J.) (Decision). The district court awarded Chambless an actuarially-adjusted pension in the amount of $2,689.02 per month. It also awarded plaintiff's counsel $416,191.30 in attorney's fees for work related to the claim upon which Chambless had prevailed.
 
 
 11
 Initially, Chambless had characterized his complaint as a "seamless web," see Chambless IV, 815 F.2d at 872, and had requested fees of approximately $1.5 million for all legal work. Plaintiff then reduced this request by 25 percent to eliminate such claims as were clearly unrelated to the theory upon which he had prevailed. In calculating the fee, the district court found some of the submitted time sheets cryptic to the point of uselessness and accordingly reduced plaintiff's requested fee by 15 percent to "ensure that the fee award excludes inadequately documented expenditures of time." But Judge Carter concluded that the fee request was still excessive; Chambless' voluntary 25 percent reduction did not go far enough to eliminate work on claims unrelated to the favorable award. The district judge therefore reduced the fee by an additional 15 percent. As a result, Chambless' initial fee application was reduced by a total of 55 percent: 25 percent by Chambless himself, and court reductions of 15 percent for inadequate documentation and 15 percent to exclude time spent on unrelated claims.
 
 
 12
 To calculate an hourly rate for Chambless' attorneys that reflected both inflation and delayed payment because of the protracted history of the case, the district court divided the litigation into two time periods subject to different hourly rates, but declined to add interest to the award on the grounds that its rates for the earlier hours were generous enough to compensate for the time that elapsed since the services had been rendered. The hourly rates for both time spans were what the district court determined to represent the market rate for small to medium-sized firms. In addition, the fee calculation reimbursed Chambless' attorneys for the payroll cost of paralegals and law clerks rather than their customary billable hourly rate, which plaintiff had sought. This portion of the award was similarly reduced by 30 percent for inadequate documentation and unrelated claims.
 
 
 13
 Turning to Chambless' pension benefits, the court denied his request for post-1977 cost-of-living adjustments on the grounds that the Plan allows such increases only to actual benefit recipients. As a result, plaintiff could not receive cost-of-living adjustments for years before he retired when he was not yet a recipient. Significantly, the district court accepted Chambless' argument that his benefits should be actuarially adjusted to reflect the fact that his life expectancy was shorter when he began receiving benefits in 1986 than when he attempted to retire in 1977. Such an increase, the district court concluded, was not the functional equivalent of retroactive benefits. The district court therefore set Chambless' benefits at $2,689.02, or approximately three times the amount he would have received in 1977.
 
 
 14
 After plaintiff had accepted the district court's invitation to make certain other submissions, including a supplemental fee application, the district court, upon reargument, fine-tuned plaintiff's fee award to $451,990.50, but rejected all other arguments. 697 F.Supp. 642, 649-50 (S.D.N.Y.1988) (Chambless V ) (September 16, 1988 judgment). Plaintiff's second supplemental fee application was denied in an endorsement order of October 19, 1988. The judgment was amended on January 11, 1989 to allow plaintiffs to recover their costs, and on March 15, 1989 the district court denied defendants' motion to delete plaintiff's cost award from the amended judgment. Chambless appeals the amount of attorney's fees awarded his counsel. The union cross-appeals the amount of the Chambless' actuarially-adjusted pension benefits. We affirm Judge Carter's award of attorney's fees, except for the amount granted for paraprofessional services, and reverse the pension benefits award. We discuss first the pension award and then the attorney's fees award.
 
 II DISCUSSION
 A. Chambless' Benefits
 
 15
 This discussion assesses the propriety of the district court "actuarially adjusting"--more than tripling--Chambless' monthly benefits from $859.43 to $2,689.02.
 
 
 16
 It is axiomatic that once a court of appeals decides a question, the district court must follow that ruling upon remand. See Doe v. New York City Dept. of Social Servs., 709 F.2d 782, 788 (2d Cir.), cert. denied, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). Similarly, under the doctrine of law of the case we too must generally adhere to the earlier panel's ruling. See id. at 789 (collecting cases). The clarity of our prior holding in Chambless III speaks for itself: "[T]he district court was correct in not awarding retroactive benefits but instead requiring the Plan to pay Chambless, upon his retirement, the monthly amount he would have received had he retired in 1977." 772 F.2d at 1042 (emphasis added). Because the district court upon remand bestowed retroactive benefits or their equivalent, that judgment must be reversed.
 
 
 17
 In its July 20 opinion, the district court recognized "the undisputed fact" that Chambless may not receive retroactive benefits. Nonetheless, it awarded the economic equivalent, labeling it "actuarial adjustment" rather than "retroactive benefit," as if the two were distinct, like apples and oranges. It attempted to sharpen its distinction by noting that an actuarial adjustment
 
 
 18
 would not alter the total amount of pension benefits to which [Chambless] is entitled over the course of his expected lifetime. It would merely recognize that that amount will now be payable over a shorter period of time. Thus, viewed from the perspective of his total projected lifetime benefits, the adjustment plaintiff seeks would not increase his benefits.
 
 
 19
 Decision at 37.
 
 
 20
 We have no quarrel with the observation that a 65-year-old has a shorter life expectancy than a 55-year-old. But the fallacy in the July 20 opinion is its underlying assumption that Chambless was entitled to a set sum--evidently based on life expectancy--regardless of how long he was on the Plan's pension rolls. Based on this erroneous premise, the district court compensated Chambless believing that because he would be paid for a shorter period of time, the amount of each payment should be increased. Chambless has not pointed to, nor have we found, a section of the Plan regulations that specifically or even implicitly suggests that claimants must receive a given total amount of benefits. As Chambless is not entitled to a specific total sum, obviously no adjustment is necessary to make sure that he receives such an award.
 
 
 21
 In addition, the district court erred by focusing on how and when the benefits were paid to Chambless--apparently defining "retroactive benefits" to mean a lump sum payment for benefits previously withheld. But the reason we disallowed retroactive payments had nothing to do with whether or not they were paid at once. We recognized previously that Plan pensioners cannot receive retirement benefits until they actually retire; Chambless did not retire from the maritime industry until 1986. See Chambless III. This was the rationale for denying plaintiff retroactive payments, defined as payments for the years 1977-86. Payments that in any way compensate Chambless for the years 1977-86 are retroactive benefits--regardless of how they are labeled--and regardless of whether Chambless receives them in one lump sum in 1986 or, as the district court directed, in monthly installments after 1986.
 
 
 22
 Accordingly, the district court should enter judgment directing the Plan to provide Chambless with a monthly benefit of $859.43 per month, the amount he would have received under the husband and wife pension plan option had he been allowed to retire in 1977. We affirm Judge Carter's ruling that now that Chambless has begun to receive benefits, he is entitled to whatever cost-of-living adjustments the Plan has awarded other recipients from the date of his application in October of 1986. Because the adjustment to Chambless' benefits was incorrect, the issue of whether plaintiff should be awarded interest on that adjustment is moot.
 
 B. The Amount of Attorney's Fees
 
 23
 We note at the outset that our scope of review on an award of attorney's fees is circumscribed. An assessment of such an award entails a detailed ad hoc inquiry into the particular case. See Blanchard v. Bergeron, --- U.S. ----, 109 S.Ct. 939, 946, 103 L.Ed.2d 67 (1989) ("It is central to the awarding of attorney's fees ... that the district court judge, in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case."). Having tried the case, the district court has the best vantage point from which to assess the skill of the attorneys and the amount of time reasonably needed to litigate a case. Therefore, its calculation of attorney's fees will not be disturbed absent an abuse of discretion. See, e.g., Hensley v. Eckerhart, 461 U.S. at 437, 103 S.Ct. at 1941; In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 226, 237 (2d Cir.), cert. denied, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987).
 
 
 24
 With the exception of reimbursement for paraprofessionals necessitated by a recent Supreme Court case to be discussed below--rendered after Judge Carter's opinion--we cannot say there has been an abuse of discretion. Hence, Judge Carter's rulings on attorney's fees and costs are affirmed in all other respects for substantially the reasons stated in his exhaustive opinions of July 20, 1988 and September 16, 1988. But we take this opportunity to add a few comments.
 
 
 25
 1. Reimbursement for Paralegals and Law Clerks
 
 
 26
 The district court awarded appellant's attorneys the payroll cost--rather than the customary billing rates--for paralegals and law clerks who worked on this litigation. This allowed counsel to break even--but without making a profit--for its use of paraprofessionals. In focusing on cost rather than the prevailing market rate, the district court properly followed our holding in City of Detroit v. Grinnell Corp., 495 F.2d 448, 473 (2d Cir.1974), that the prevailing attorneys "must be reimbursed for [paralegals'] wages even though their time cannot be considered as input in the fee award determination."
 
 
 27
 Chambless argued that Grinnell was no longer good law, relying on United States Football League v. National Football League, 704 F.Supp. 474 (S.D.N.Y.1989). Appellant's assertion of Grinnell's demise initially appeared premature, but it subsequently proved prescient. While this appeal was sub judice, the Supreme Court decided Missouri v. Jenkins, --- U.S. ----, 109 S.Ct. 2463, 105 L.Ed.2d 229 (U.S.1989), under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. Sec. 1988 (1982). Although this is not a Sec. 1988 case, the Supreme Court instructs us that the same standards apply to other fee-shifting statutes where an award is made to the prevailing party. See Hensley, 461 U.S. at 433 n. 7, 103 S.Ct. at 1939 n. 7.
 
 
 28
 In Jenkins the High Court ruled that a reasonable attorney's fee should be calculated to reimburse paralegals at market rates rather than cost, where that is the custom of the local legal community. The Supreme Court noted that "separate billing [for paralegals] appears to be the practice in most communities today." --- U.S. at ----, 109 S.Ct. at 2468-70. Because it was constrained at the time by Grinnell, the district court did not make a finding on whether New York law firms typically bill paralegals at hourly rates. Accordingly, we must remand for a finding on that issue; if that is the prevailing practice among New York firms, and direct the district court to award Chambless' attorneys reimbursements for paralegal time in accordance with Missouri v. Jenkins.
 
 
 29
 2. Setting Plaintiffs' Hourly Rate by Reference to Small to Medium Firms
 
 
 30
 After determining the number of hours reasonably needed to litigate the prevailing case, the district court under the "lodestar" analysis ascertained a reasonable rate by which to multiply the number of hours. The Supreme Court has stated that awards of attorney's fees must be calculated according to "the prevailing market rates in the relevant community...." Blum v. Stenson, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). Chambless argues that the district court violated this mandate when it set the hourly rates for the lodestar calculation by reference to small to medium-sized firms. We do not think the above-quoted language from Blum v. Stenson compels district courts to assign the same hourly rate to every law firm in the same city. On the contrary, under the Blum v. Stenson formulation, the district court must ascertain whether "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Id. at 896 n. 11, 104 S.Ct. at 1547 n. 11 (emphasis added). Thus, as the district court implicitly recognized, several market rates may prevail in a given area, particularly one with as large and diverse a legal community as New York City.
 
 
 31
 The burden was on Chambless to establish his hourly rate with "satisfactory evidence--in addition to the attorney's own affidavits...." Id.; see also Hensley, 461 U.S. at 437, 103 S.Ct. at 1941. The primary evidence that Chambless provided on this issue--aside from affidavits of his attorneys--was an article in the Manhattan Lawyer that listed billing rate increases for 14 large firms in New York City, including the firm that represented the union, but not including Chambless' firm. The district court found this evidence "meager," and properly accorded it little weight. See Miele v. New York State Teamsters Conf. Pension & Retirement Fund, 831 F.2d 407, 409 (2d Cir.1987) (district judge may rely in part on his or her own knowledge of hourly rates charged in community and is not limited to the submitted evidence of prevailing rates).
 
 
 32
 Moreover, the Manhattan Lawyer article itself supports the proposition that smaller firms may be subject to their own prevailing market rate. See Manhattan Lawyer, May 11, 1987, at 31, col. 1 ("Raising rates has been trickier for mid-sized and smaller firms because blue-chip clients frequently turn to them thinking they'll get lower bills."). In light of plaintiff's proffered evidence, it is hardly surprising that the district court chose to interject its own knowledge.
 
 3. Fee Parity
 
 33
 We are similarly unpersuaded by Chambless' demand for "fee parity" with the Plan's counsel--a "large" firm, which was paid under an insurance policy. See Sokolowski v. Aetna Life & Casualty Co., 670 F.Supp. 1199 (S.D.N.Y.1987). In essence, appellant contends that his attorneys should be paid as much as the union's attorneys. We agree with the district court that the prevailing market rate test does not mandate equal fees for opposing counsel. See Chambless V, 697 F.Supp. at 646.
 
 
 34
 Further, in the circumstances of this case, the fees the Plan paid its counsel are not particularly helpful in setting a reasonable rate for Chambless' attorneys. The two parties had entirely different stakes in the litigation. Chambless brought the suit primarily to recover his own individual Plan benefits, even though he achieved a broader effect. The Plan, in contrast, is composed of numerous participants like Chambless, and it had already been the defendant in a class action suit that raised issues analogous to those raised in the instant litigation. See Sokolowski, 670 F.Supp. at 1201-02. Doubtless the Plan considered the res judicata potential of Chambless' complaint when it structured its defense. Accordingly, even though Chambless' and the Plan's attorneys were arguing about two sides of the same coin, the difference in the precedential value of the case to their respective clients could vary markedly and could well justify a divergence between the fees they charged. See Johnson v. University College of the Univ. of Ala., 706 F.2d 1205, 1208 (11th Cir.), cert. denied, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983); Mirabal v. General Motors Acceptance Corp., 576 F.2d 729, 731 (7th Cir.) (per curiam), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978).
 
 
 35
 There may be instances when district courts will want to consider--among the myriad of other factors--the fees charged by opposing counsel. Cf. Taylor v. Scarborough, 66 F.2d 589, 591 (2d Cir.1933) (in attorney's suit for lien for services rendered, opposing counsel's fees were persuasive though not conclusive). But here, what the Plan's counsel charged was irrelevant for calculating a reasonable fee for Chambless' attorneys, and it was not an abuse of the district court's discretion to decline to match appellant's attorney's fees to those of his adversaries.
 
 4. Delay in the Payment of Fees
 
 36
 To spare the parties yet a fourth appeal to this Court, we acknowledge the observation in Missouri v. Jenkins that "an appropriate adjustment for delay in payment--whether by the application of current rather than historic hourly rates or otherwise" is consistent with the goals of fee-shifting statutes. --- U.S. at ----, 109 S.Ct. at 2471-72. The district court expressly recognized its duty to consider this factor of delay. Although it denied plaintiff's request for interest, it employed hourly rates that were " 'sufficiently generous ... to ensure that plaintiff will be amply compensated for all delay.' " Chambless V, 697 F.Supp. at 645 (quoting July 20 opinion). The above-quoted language from Missouri v. Jenkins suggests that district courts retain latitude in determining how they will compensate prevailing attorneys for delay.
 
 III CONCLUSION
 
 37
 The award of pension benefits is reversed and the case is remanded for an award of benefits consistent with this opinion. The case is also remanded for an award of paralegal fees consistent with Missouri v. Jenkins. The rulings on attorney's fees and costs are otherwise affirmed.
 
 
 38
 Reversed in part, affirmed in part, and remanded.