Peter **SEITZMAN, M.D., Plaintiff–Appellant–Cross Appellee,**

v.

**SUN LIFE ASSURANCE COMPANY OF CANADA, INC., Defendant–Appellee–Cross Appellant.**

**Docket No. 01–9142.**

United States Court of Appeals, Second Circuit.

Argued: June 24, 2002.

Decided: Nov. 14, 2002.

Gregory Antollino, New York, NY, for Appellant–Cross–Appellee.

David K. Fiveson, Butler, Fitzgerald & Potter, New York, NY, for Appellee–Cross Appellant.

Before: JACOBS, LEVAL, KATZMANN, Circuit Judges.

JACOBS, Circuit Judge.

This appeal over attorneys' fees arises from a lawsuit under the Employee Retirement and Income Security Act of 1974 ("ERISA"), in which Plaintiff–Appellant Peter Seitzman, M.D., sought disability insurance benefits from Sun Life Assurance Company of Canada, Inc. ("Sun Life"). Dr. Seitzman claimed that he was totally disabled from working at his occupation as a practitioner of internal medicine because of medical problems, caused by the HIV virus and other illnesses, that included asthma, HIV-related diabetes, diarrhea, hypertension, peripheral neuropathy, and corresponding symptoms.

The United States District Court for the Southern District of New York (Preska, J.) found that Dr. Seitzman was not totally disabled under the terms of his disability insurance contract (as he asserted) because he was able to perform the substantial and material duties of his occupation on June 8, 1998 and for ninety days there-

after, and entered judgment dismissing the claim. This court affirmed that judgment by summary order, *see Seitzman v. Sun Life Assur. Co. of Canada,* 7 Fed. Appx. 89 (2d Cir.2001).

The district court thereafter entertained Sun Life's post-trial motion for attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1). The court found that Sun Life was entitled to fees and costs because: [1] Dr. Seitzman brought the underlying claim for disability benefits in bad faith, and the relative merits of the parties' positions weighed in favor of Sun Life; [2] a fee award to Sun Life would deter others from bringing similarly meritless claims; and [3] Dr. Seitzman could afford to satisfy an award of fees and costs. The amount of fees and costs claimed was found reasonable, but the court awarded Sun Life only half of that amount.

On appeal, Dr. Seitzman argues that the findings as to bad faith, lack of merit and deterrence amount to an abuse of discretion. Sun Life cross-appeals, challenging the fifty percent reduction. For the reasons set out below, we affirm as to the award of fees in the amount awarded.

**BACKGROUND**

In the underlying lawsuit, Dr. Seitzman claimed to have become totally disabled from doing his work, as a sole practitioner of internal medicine, by reason of various medical problems mostly related to HIV infection.

A review of the underlying facts is essential to an understanding of the issues concerning attorneys' fees. Unless otherwise noted, the facts set forth here are uncontested or as found by the district court in connection with the judgment that has already been affirmed, but because our affirmance was unpublished, we do not assume familiarity with it.

Dr. Seitzman diagnosed himself with the HIV infection in 1986, and beginning in 1989 he experienced symptoms or illnesses associated with this condition. In 1989 he was afflicted with diarrhea, which worsened in 1995. In 1994, he diagnosed himself with diabetes, and in 1997, peripheral neuropathy (resulting in foot pain). Dr. Seitzman testified that his health deteriorated in the mid- and late 1990s, but he relied primarily on himself for treatment until February 1998.

In December 1996, Dr. Seitzman sold his medical practice for $1.5 million to TPS of New York, Inc. ("TPS"), but agreed that he would continue the clinical duties of the practice as an employee of an affiliated company, Manhattan Medical Care, P.C. ("Manhattan") until approximately mid-June 1998, and would during that time help locate, hire and train a physician to replace him. In December 1996, Dr. Seitzman filled out a health questionnaire for TPS in connection with his new employment, in which he denied that he had trouble breathing, climbing stairs, or standing, denied that he suffered tremors or pain, and denied taking drugs that might affect his job performance.

An insurance contract (hereinafter the "Plan") issued to Dr. Seitzman's employer, TPS, entitled him to total disability benefits if, "because of Injury or Sickness, [he was] unable to perform the material and substantial duties of his own occupation."

In late November 1997, Dr. Patrick Dalton was hired to assume the clinical duties at the practice under an employment agreement stating that Dr. Seitzman's employment at the practice would end on or about June 15, 1998, and providing in essence that Dr. Dalton then would be a sole practitioner. Between January 1998 (when Dr. Dalton began work) and June 1998 (when Dr. Seitzman left), Dr. Seitzman's duties gradually shifted to Dr. Dalton. These duties included examining and treating patients; making hospital rounds; performing skin biopsies; treating warts, lesions and abscesses; and prescribing and administering medicine. Although Dr. Seitzman had previously performed spinal taps and drawn blood, spinal taps were no longer performed on-site and, pursuant to Dr. Dalton's employment contract (which entitled him to an additional staff person), the practice hired a phlebotomist to draw blood. The staff was notified in April that Dr. Seitzman would be leaving June 11, 1998. By May and early June of 1998, in anticipation of Dr. Seitzman's departure, Dr. Dalton was performing almost all of the clinical duties of the practice.

On June 8—three days before Dr. Seitzman's scheduled departure—he suffered what he characterized as a "severe" asthma attack on his way to work. He went to his physician, Dr. Felder, who reported that though Dr. Seitzman was wheezing, his heart rate and blood pressure were normal. After leaving Dr. Felder's office, Dr. Seitzman advised his office by phone that he had become overwhelmed by medical problems and could not go back to his job.

On June 22, 1998, Seitzman filed a claim with Sun Life seeking a $10,000 monthly benefit for total disability allegedly commencing on June 8, 1998. According to the claim form, he had a hectic practice as a sole practitioner who worked seven days a week, with five days spent treating patients and making hospital rounds, and though he worked a full day on June 7, 1998, he was totally unable to work on June 8 because he suffered from HIV, diabetes, peripheral neuropathy, asthma, and depression. He expected never to return to work full-time or part-time.

Sun Life denied benefits in late 1998, and never rendered a decision on Dr. Seitzman's administrative appeal. Dr.

Seitzman sued, and the lawsuit proceeded to a bench trial before Judge Preska.

The evidence at trial was that Dr. Seitzman had various medical problems, including HIV infection, asthma, diabetes, diarrhea, hypertension, peripheral neuropathy, and depression, disorders which could cause (among other things) dizziness, fatigue, memory loss, foot pain and tremors. Dr. Seitzman testified that these symptoms and the side-effects of medication prevented him from performing the material functions of his occupation; that, for example, one drug caused memory loss and incoherence; and that among other things, he could no longer draw blood, take spinal taps, examine patients, make hospital rounds, render diagnoses, and administer medicine. Dr. Seitzman's expert witness (Dr. Brook) and his treating physician (Dr. Felder) opined that Dr. Seitzman could not perform the "material and substantial duties of his own occupation" by reason of his various illnesses and symptoms.

Dr. Dalton testified that prior to June 8, 1998, Dr. Seitzman did not complain about inability to work. Dr. Dalton had observed Dr. Seitzman draw blood, treat warts and lesions, and examine patients, all without evident physical difficulty. Dr. Dalton was unaware that Dr. Seitzman was ill until Dr. Seitzman failed to come in on June 8.

The long-time office manager in Dr. Seitzman's office, Virginia Speck, had worked daily with Dr. Seitzman in 1998. She confirmed that Dr. Seitzman did not complain about an inability to work until June 8, 1998. Between January and June of 1998, she observed no incapacity. Moreover, she had known at least before Dr. Dalton was hired in November 1997, that Dr. Seitzman wanted to retire by the middle of June 1998: he wanted to "enjoy life while he was feeling well," and "enjoy the fruits of what he had earned." Ms. Speck planned a surprise retirement party for Dr. Seitzman on June 10, 1998—which he attended.

Notwithstanding Dr. Seitzman's claim on June 22, 1998 that he expected never to work again, he applied a month later for a job as a claims analyst for the State of New York. In the application, which was affirmed to be true under penalty of perjury, he falsely stated that he was self-employed as a physician-internist, and made no mention of the sale of his medical practice or his employment with Manhattan/TPS. In another employment application (also affirmed to be true), submitted in September 1998, Dr. Seitzman disclosed his employment with Manhattan/TPS but stated that he left because they "went bankrupt." Again, Dr. Seitzman referenced no disability.

TPS soon defaulted on payments under the contract of sale, and on August 20, 1998, Dr. Seitzman commenced an action to repossess his practice. In sworn pleadings filed with the Supreme Court, Dr. Seitzman claimed that he had "voluntarily terminated" his employment with Manhattan/TPS.

Dr. Seitzman started work as a claims analyst for New York State on September 17, 1998, and remained employed there at the time of trial in June 2000. According to Dr. Seitzman, although he could not perform his occupation as a treating physician because of his inability to concentrate or render medical diagnoses, he was able to perform the 30 hour per week job with the State, which required him to review medical records, consult with training staff, and assess the validity of medical impairments. Dr. Seitzman claimed that he could manage the State employment by working one hour a day, and sleeping the rest of the time. Dr. Seitzman's supervisor testified, however, that Dr. Seitzman

came to work regularly, was punctual, performed satisfactorily, did not abuse sick leave, and was not observed napping. Although Dr. Seitzman initially denied that he maintained time records in this job, he conceded otherwise at trial; the records showed no more than fourteen hours of sick leave from September 1998 through April 28, 1999.

Dr. Seitzman also submitted a claim to John Hancock for $15,000 monthly total disability benefits commencing June 8, 1998, under a separate insurance plan. His claim forms, submitted in October, November, and December 1998, and in January 1999, denied that he had been to his "place of business" since his last monthly report (despite his work as a claims analyst during these months). Dr. Seitzman claimed that he could perform "none" of his occupational duties, and he failed to disclose (though asked) the date he returned to work on a full or part-time basis.

Based on the trial evidence, the district court concluded that Dr. Seitzman was able to perform the substantial and material duties of his occupation on June 8, 1998, and for 90 days thereafter. The court discredited Dr. Seitzman's testimony "largely, if not totally," citing his "attitude and demeanor on the stand," and several material statements (in documents related to his claim and in his trial testimony) that were "inaccurate, misleading, and false."

■ After we summarily affirmed the judgment, the district court entertained Sun Life's motion for attorneys' fees. The court evaluated the motion under the test set out in *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869 (2d Cir.1987), which mandates consideration of five factors:

(1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award

of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Id.* at 871.

The district court found that the first four *Chambless* factors weighed against Dr. Seitzman, found that the fifth factor (not at issue on appeal) was inapplicable, and concluded that Sun Life was entitled to attorneys' fees. As to the amount, the court found (and Dr. Seitzman does not contest on appeal) that the amount of fees it requested ($208,486.63) was reasonable, but awarded Sun Life half of that amount. On appeal, Dr. Seitzman challenges the award of attorneys' fees and Sun Life cross-appeals the fifty percent reduction.

## DISCUSSION

■ ERISA provides for the award of attorneys' fees and costs to either party. *See* 29 U.S.C. § 1132(g)(1); *Miller v. United Welfare Fund*, 72 F.3d 1066, 1074 (2d Cir.1995). Such an award "lies within the discretion of the district court." *Chambless*, 815 F.2d at 871. This court reviews the decision to award or deny attorneys' fees for abuse of discretion. *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 138 (2d Cir.2000). A trial court "abuses its discretion if its conclusions are based on an erroneous determination of law, or on a 'clearly erroneous' assessment of the evidence." *Matthew Bender & Co. v. West Publ'g Co.*, 240 F.3d 116, 121 (2d Cir.2001) (internal quotation marks and citations omitted). A factual finding is "clearly erroneous" only if, after review of the complete record, the appellate court is left with the definite and firm conviction that a mistake has been committed. *Anderson v.*

*City of Bessemer City, North Carolina,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1984).

## I

Seitzman argues the district court abused its discretion in making *Chambless* findings as to bad faith, the relative merits of the parties' positions, and the deterrence of similarly frivolous cases.

### A. *Bad Faith and Relative Merits*

We consider jointly the first and fourth *Chambless* factors, which in this case are intertwined.

In *Salovaara v. Eckert,* 222 F.3d 19 (2d Cir.2000), we ruled that a benefits claimant who has a reasonable belief that he is entitled to benefits (*i.e.,* a colorable claim) is not acting in bad faith, *id.* at 29–30, and reversed a finding of bad faith that heavily relied on the plaintiff's failure (by reason of a misunderstanding of the case law) to adduce evidence in support of his central arguments. *Id.* Also insufficient to show bad faith was the "passing mention" of a fact in the plaintiff's legal memorandum that plaintiff later contradicted. *Id.* at 30.

Along the lines of *Salovaara,* Dr. Seitzman contends that he had a reasonable belief that he was "unable to perform the material and substantial duties of his own occupation" (the insured risk) because he suffered from various medical problems that prevented him from performing his work-related tasks. He relies (*inter alia* ) on the following evidence:

- Dr. Seitzman's medical expert, Dr. Brooke, testified that Dr. Seitzman was disabled;
- Dr. Felder, who treated Dr. Seitzman, testified and advised Sun Life by letter that Dr. Seitzman suffered from depression, peripheral neuropathy, asthma, high blood pressure, high blood sugar, high cholesterol and high triglycerides, and that the asthma attack on June 8, 1998 prevented Dr. Seitzman from performing the duties of his occupation as an internal medicine physician;

- Dr. Seitzman testified that his health prevented him from performing his duties as a treating physician: *inter alia,* he could not draw blood or take spinal taps, because of tremors; he could not stand for prolonged periods to examine patients, because of peripheral neuropathy; and he was otherwise limited by memory loss, fatigue, and incontinence;

- Dr. Seitzman also testified that his desk job reviewing disability claims did not require the skills or physical capabilities needed for him to function as a practicing physician;

- Dr. Coblentz, an expert for Sun Life, testified that Dr. Seitzman's diabetes was poorly controlled;

- Dr. Dalton testified that during the first three months of 1998, Dr. Seitzman worked less, visited his doctor often, and on occasion issued inappropriate prescriptions; and

- Ms. Speck testified that Dr. Seitzman: told her in 1997 that he was using Stadol to treat the "incredible" pain in his feet caused by the peripheral neuropathy; spent a lot of time in bathroom; seemed fatigued, tremulous and forgetful; and had been scheduled to see patients on June 9, 1998.

The citation of this evidence does not compel the finding that Dr. Seitzman reasonably believed he was entitled to benefits. The district court declined to credit most, if not all, of Dr. Seitzman's testimony, citing his demeanor and false statements he made in employment applica-

484

tions, claim forms, and a sworn pleading filed in state court. The district court also declined to credit the opinions of Dr. Brook and Dr. Felder, which (as they conceded) were wholly based on Dr. Seitzman's own description of his symptoms. The testimony of Dr. Dalton and Ms. Speck showed that Dr. Seitzman had medical problems, not that he was disabled as a result.

The testimony and evidence credited by the district court established (*inter alia*) that: [1] Dr. Seitzman sold his medical practice in December 1996 when he was relatively healthy, as indicated by the questionnaire he filled out for TPS in 1996; [2] Dr. Seitzman agreed when he sold his practice that he would retire in mid-June 1998 after the clinical responsibilities were transferred to another physician; [3] when Dr. Dalton was hired in late 1997 to assume the clinical responsibilities of the practice, his employment contract provided that Dr. Seitzman would leave in June 1998; [4] prior to June 8, 1998, Dr. Seitzman did not miss work days; [5] throughout 1998, Dr. Dalton and Ms. Speck observed Dr. Seitzman performing his work without impairment; [6] Dr. Dalton did not know that Dr. Seitzman was ill until Dr. Seitzman failed to come to work on June 8; [7] Dr. Seitzman evidently did not suffer from disabling foot pain, because between February and May 1998 he traveled to medical conferences in Chicago, Puerto Rico, San Diego, Arizona, and Denver; [8] Dr. Seitzman did not take Stadol until after June 8, 1998; and [9] a board certified neurologist, Dr. Coblentz, opined that Dr. Seitzman was not disabled.

Credibility determinations are within the province of the trial court and are entitled to considerable deference. *See Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002). Where a court chooses between two permissible views, the reviewing court "will not second guess the trial court so long as its view of the evidence is plausible in light of the entire record." *Id.* Here, the trial court's credibility findings treat the evidence in a way that is more than plausible. Without Dr. Seitzman's testimony, there is no independent evidence to support a reasonable belief that Dr. Seitzman was unable perform the "material and substantial duties" of his occupation. We therefore find no abuse of discretion in the finding of bad faith.

As to the relative merits of the parties' positions, (the fourth *Chambless* factor), we conclude for reasons that are obvious from the discussion above that the district court did not abuse its discretion in deciding that the merits weigh in favor of Sun Life.

Dr. Seitzman challenges on appeal several points that together could have had bearing on the district court's fact finding.

- As to the submission of false information, Dr. Seitzman contends that he did not lie in stating (in his John Hancock claim form) that he was unable to work part-time or full-time, because the work contemplated by that form was work in his prior occupation, which he could not do (he also forgot that he resided in New York). The court was entitled to reject Dr. Seitzman's explanation as to how he understood the form, and the conclusion that the claim was inaccurate and misleading is a fair inference.

- The district court noted that Dr. Seitzman inquired into his entitlement to disability benefits a month prior to his alleged disability. While we agree with Dr. Seitzman that employees are entitled to inquire about benefits, it was not error for the court to consider this event in the suggestive factual context of the

case; in any event, the court did not place undue weight on the inquiry.

- The court emphasized that Dr. Seitzman had long planned to retire on or about the date of the claimed onset of total disability. Dr. Seitzman argues that the planned retirement has no bearing on whether he was disabled. We disagree: the fact is arresting, suggestive, and fuel for a devastating inference.
- The district court found that Dr. Seitzman lied about treating his peripheral neuropathy with Stadol, and he argues on appeal that he presented post-trial evidence that he did take Stadol prior to June 8, 1998. The issue is beside the point. Whether or not he took Stadol before June 8, 1998, there is no proof that he suffered from side effects that affected his ability to perform his job.

We reaffirm our warning in *Salovaara* that ERISA's purpose of "promot[ing] the interests of plan beneficiaries and allow[ing] them to enforce their statutory rights ... often counsels against charging fees against ERISA beneficiaries since private actions by beneficiaries seeking in good faith to secure their rights under employee benefit plans are important mechanisms for furthering ERISA's remedial purpose." *Salovaara v. Eckert*, 222 F.3d 19, 28 (2d Cir.2000)(internal quotation marks and citations omitted). Unlike the plaintiff in *Salovaara*, however, Dr. Seitzman was fully aware of his burden to demonstrate entitlement to total disability benefits. And in attempting to do so, he presented testimony that was found to be deliberately false as to the most material points, in a trial context that reflected other statements by him on material matters that were at best misleading. *See Owen v. Soundview Financial Group*, 54

F.Supp.2d 305, 326–27 (S.D.N.Y.1999) (where plaintiff, a plan fiduciary, acted in bad faith by making a material misstatement of fact, an award of attorneys' fees against the plaintiff was appropriate), *aff'd*, 208 F.3d 203 (2d Cir.2000)(Table).

For essentially the same reason, Dr. Seitzman's reliance on *Gibbs v. Gibbs*, 210 F.3d 491 (5th Cir.2000), is inapposite. The ERISA claim in *Gibbs* was denied on the ground that the claimant may have arranged her husband's murder to collect his life insurance. Citing the district court's acknowledgement that it was a "close case," *Gibbs*, 210 F.3d at 505, the Fifth Circuit concluded that the claimant's position could "hardly be deemed to be so disproportionately meritless as to justify the imposition of an award of attorneys' fees." *Id.* Here, the case cannot be deemed close because (among other things) the district court discredited Dr. Seitzman's testimony "largely, if not totally," leaving no independent evidence supporting Dr. Seitzman's claim.

B. *Deterrence*

■ Dr. Seitzman argues that the assessment of attorneys' fees and costs against him will deter ERISA beneficiaries from bringing good faith claims, particularly individual claimants. We agree that an award of attorneys' fees against an ERISA claimant carries the risk of overdeterrence, which can impair the effectiveness of the statutory remedy. Presumably for that reason, the third *Chambless* factor is carefully phrased in terms of deterring "other persons from acting similarly under like circumstances," *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir.1987), and thus aims to deter crooked claimants while insulating anyone who asserts a colorable claim:

> [W]here ... an ERISA plaintiff has pursued a colorable (albeit unsuccessful)

claim, the third *Chambless* factor likely is not merely neutral, but weighs strongly *against* granting fees to the prevailing defendant. Awarding fees in such a case would likely deter beneficiaries and trustees from bringing suits in good faith for fear that they would be saddled with their adversary's fees in addition to their own in the event that they failed to prevail; this, in turn, would undermine ERISA's essential remedial purpose of protecting beneficiaries of pension plans.

*Salovaara*, 222 F.3d at 31 (emphasis in original).

The deterrence factor should be used "as a shield, to protect beneficiaries from the fear of having to pay to pursue an important ERISA claim in the event of failing to prevail," and not "as a sword to discourage beneficiaries" from pursuing certain meritless claims. *Gibbs*, 210 F.3d at 505; *see also Jones v. O'Higgins*, 736 F.Supp. 1243, 1245 (N.D.N.Y.1990) ("The favorable slant [of the *Chambless* factors] toward ERISA plaintiffs is necessary to prevent the chilling of suits brought in good faith—the purpose of ERISA being to promote the interests of plan beneficiaries and allow them to enforce their statutory rights.").

We think that the district court finding on deterrence is sound, for two reasons. First, the findings as to bad faith are careful and extensive, so that the imposition of attorneys' fees in these circumstances has no tendency to inhibit the assertion even of claims that are imperfect or on the borderline. Second, although the finding of bad faith in large part depends on credibility findings, no one need fear that any defect of recollection or bit of self-serving testimony will entail an award of attorneys' fees: the district court found that the claimant was unworthy of belief as to virtually all the material circumstances

of his claim, and that view was corroborated by findings based on other evidence.

## II. Amount of Fees

Sun Life cross-appeals from the judgment insofar as the award of attorneys' fees was half of the amount found reasonable. Sun Life argues that there is no basis in the record for this reduction.

### A. Timeliness

Dr. Seitzman contends that Sun Life's notice of cross-appeal is untimely. Dr. Seitzman's notice of appeal was filed on August 31, 2001; the cross-appeal was filed on October 1, 2001. Sun Life had fourteen days from the August 31 filing of the appeal to notice its cross-appeal. *See* FED. R.APP. P. 4(a)(3). Fourteen days from August 31 would have been September 14, 2001; however, because of this Court's September 11, 2001 emergency order, the first business day after September 10, 2001 was September 26, 2001. Thus, the fourteenth day after August 31 fell on Saturday, September 29. When the last day of the period is a Saturday, Sunday or holiday, it is not counted. *See* FED. R.APP. P. 26(a)(3). The first business day after September 29 was October 1, the date Sun Life filed the notice of cross-appeal.

### B. Merits

"A district court reviewing a claim under ERISA may, in its discretion, allow a reasonable attorney's fee and costs of action to either party [under 29 U.S.C. § 1132(g) ]." *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 137 (2d Cir.2001) (internal quotation omitted). Because "the district court has the best vantage point from which to assess the skill of the attorneys and the amount of time reasonably needed to litigate a case[,] . . . its calculation of attorney's fees will not be disturbed absent an abuse of discretion." *Chambless*

*v. Masters, Mates & Pilots Pension Plan,* 885 F.2d 1053, 1057–58 (2d Cir.1989).

■ The lodestar method is ordinarily the starting point in determining the amount of fees that may be awarded. *See Chambless,* 885 F.2d at 1058–59. The lodestar method entails two findings: (1) the reasonable hourly rate; and (2) the number of hours reasonably expended. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The time component reflects the hours worked by the lawyer (supported by time records) that are neither excessive nor duplicative, and that do not reflect work done only in connection with unrelated claims on which the party did not succeed. *Quaratino v. Tiffany & Co.,* 166 F.3d 422, 425 (2d Cir. 1999).

■ In this case, neither party contests the district court's finding that the amount Sun Life requested—$208,486.63—was reasonable, so we consider on appeal only the propriety of the reduction in the fee award.

Section 1132(g) authorizes courts to exercise discretion in awarding reasonable fees and costs, but furnishes no guidance for how that discretion is to be exercised.[1] However, it is clear that a trial court has discretion to make a partial award. *See Chambless,* 815 F.2d at 872–73 (holding that the district court should have awarded the plaintiff attorneys' fees with respect to the amount of time plaintiff's counsel devoted to plaintiff's one successful claim, even though most of his claims were found to be without merit).

■ A partial award is ordinarily based on [i] the court's lodestar calculation of reasonable fees and costs, and may thus exclude for example fees expended on redundant or otherwise unnecessary work, or on issues unrelated to the meritorious claim, *see, e.g., Am. Communications Assoc., Local 10, I.B.T. v. Ret. Plan for Employees of RCA Corp.,* 507 F.Supp. 922, 924 (S.D.N.Y.1981) (Weinfeld, *J.*) or [ii] the balancing of the *Chambless* factors, *see Smith v. Miller Brewing Co. Health Benefits Program,* 860 F.Supp. 855, 857–58 (M.D.Ga.1994) (Although the $35,184.74 in attorneys' fees expended on behalf of plaintiff was reasonable, the court awarded him $20,000, "reflect[ing] the court's judgment that his position was favored by about 55% over Defendant's position.").

Sun Life points out that the district court made no findings that expressly bear upon the percent of the discount, and argues that the halving of the lodestar amount was an abuse of discretion. *See Jones v. UNUM Life Ins. Co. of Am.,* 223 F.3d 130, 138–39 (2d Cir.2000).

The reduction of an award (as in this case) must have a basis in the record. An explanation of the reasons for the reduction can be helpful in assuring a reviewing court that the action was not arbitrary. Nonetheless, here we have the benefit of the district court's extensive findings on the *Chambless* factors as well as the undisputed facts that support the reasonableness of the ruling: while Dr. Seitzman has sufficient capital to pay the fees in full, he is retired from the most lucrative phase of his career, he lives on his savings, and he suffers from a chronic and expensive ailment. Thus the record reflects (at least) two circumstances—ability to pay, and the need to avoid over-deterrence—that suffi-

1. 29 U.S.C. § 1132(g)(1) provides:
(1) In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

ciently justify an exercise of discretion to reduce the fee award.

## CONCLUSION

For the foregoing reasons, we affirm the ruling that attorneys' fees may be awarded as well as the award of half the lodestar amount.