05-5849(L), 06-4178 -cv
Slupinski v. First
Unum Life Insurance Co.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2007

(Argued: February 19, 2008     Decided: January 23, 2009)

Docket Nos. 05-5849(L), 06-4178 -cv

_____

ZBIGNIEW SLUPINSKI,

Plaintiff-Appellant,

- v. -

FIRST UNUM LIFE INSURANCE COMPANY and WEIL, GOTSHAL & MANGES LONG TERM DISABILITY INCOME PLAN,

Defendants-Appellees.

_____

Before: KEARSE, CALABRESI, and KATZMANN, Circuit Judges.

Appeals from so much of a judgment and postjudgment order of the United States District Court for the Southern District of New York, Thomas P. Griesa, Judge, as denied plaintiff's requests for attorney's fees and prejudgment interest in connection with his successful claim under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., for reinstatement of long-term disability income benefits.

Reversed and remanded.

DAVID S. PREMINGER, New York, New York (Rosen Preminger & Bloom, New York, New York, on the brief), for Plaintiff-Appellant.

LOUIS M. LAGALANTE, New York, New York (Gallagher, Harnett & Lagalante, New York, New York, on the brief), for Defendants-Appellees.

KEARSE, Circuit Judge:

Plaintiff Zbigniew Slupinski appeals from so much of a judgment and postjudgment order of the United States District Court for the Southern District of New York, Thomas P. Griesa, Judge, as denied his requests for attorney's fees and prejudgment interest in connection with his successful claim under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., against defendants First Unum Life Insurance Co. ("First Unum") and Weil, Gotshal & Manges Long Term Disability Income Plan for reinstatement of long-term disability income benefits ("disability benefits"). The district court denied attorney's fees on the ground that First Unum, administrator of that plan, had not acted in bad faith or with the requisite degree of culpability and that Slupinski's lawsuit did not provide a common benefit to a group of beneficiaries. The court denied prejudgment interest on the ground that Slupinski had delayed in commencing suit and in litigating the suit once it was commenced. On appeal, Slupinski contends that the court erred in applying the factors that are pertinent to both attorney's fee awards and prejudgment interest. For the reasons that follow, we reverse the denial of attorney's fees and prejudgment interest and remand for determinations of the appropriate amounts due Slupinski.

- 2 -

## I.  BACKGROUND

The following description of the events is drawn largely from the district court's opinion dated September 16, 2005, and docketed as of September 27, 2005, see Slupinski v. First Unum Life Insurance Co., No. 99 Civ. 0616, 2005 WL 2385852 (S.D.N.Y. Sept. 27, 2005) ("Slupinski I"), ruling in favor of Slupinski on the merits of his claim that First Unum had improperly terminated his long-term disability benefits.  Familiarity with Slupinski I is assumed.

## A.  Slupinski's Employment and Disability Benefits

In August 1991, Slupinski was an associate attorney in the law firm of Weil, Gotshal & Manges LLP ("Weil Gotshal") and was covered by the firm's Long Term Disability Income Plan (the "Plan").  First Unum was the Plan's administrator and insurer. The Plan provided that employees who became disabled for a significant period of time, due to injury or sickness for which they required the regular attendance of a physician, would receive monthly long-term disability ("LTD") payments during the period of disability.  The Plan defined the terms "disabled" and "disability" in pertinent part to mean

> that because of injury or sickness:
>
> 1.  the insured cannot perform each of the material duties of his regular occupation; and
>
> 2.  after benefits have been paid for 24 months, the insured cannot perform each

- 3 -

                         of the material duties of any gainful
                         occupation for which he is reasonably
                         fitted, taking into consideration
                         training, education or experience, as well
                         as prior earnings.

(Plan § II.)

On August 4, 1991, Slupinski was seriously injured in an automobile accident while on business in Poland. As a result of a collision, he was thrown from the taxi in which he was a passenger and was run over by another car. His injuries included broken ribs, leg injuries, severance of the left ulnar nerve, and severe damage to other nerves and arteries in his left arm. Slupinski was immediately hospitalized and was soon flown to London for additional hospitalization and treatment. After undergoing several surgeries on his left arm, Slupinski left London in September 1991 for the United States, where he continued to receive medical treatment.

Upon his return to the United States, Slupinski attempted to resume working at Weil Gotshal, but he was not able to do any substantial work. He had functional limitations in the use of his left arm, along with severe pain that made it impossible for him to focus or concentrate. At various times, he also reported memory loss, and he was taking pain medications that exacerbated his cognitive problems.

Slupinski ceased to work at Weil Gotshal in December 1991. He continued to experience functional limitations and pain in his left arm, and he underwent additional surgeries on that arm in subsequent years in an attempt to regain greater function. In

- 4 -

February 1992, he applied for LTD benefits under the Plan. First Unum approved the application in August 1992. It paid Slupinski for LTD benefits that had accrued to that point and thereafter made monthly benefits payments to him until 1996.

By letter dated December 1, 1995, First Unum notified Slupinski that it intended to terminate his benefits. (See Letter from First Unum to Slupinski dated December 1, 1995 ("Termination Letter" or "First Unum Termination Letter"), at 2.) The letter stated that First Unum had recently received Physical Capacities Evaluation ("PCE") forms from two physicians--Dr. Romas Sakalas and Dr. Fernando Miranda--from whom Slupinski had previously submitted letters stating that Slupinski was disabled. The First Unum letter stated that Dr. Sakalas had completed a PCE form indicating that Slupinski could "sit/stand/walk for 8 hours each" and that Dr. Sakalas "has released you to full-time employment." (Id. at 1.) The letter continued:

> We have also received recent information from Fernando G. Miranda, MD including a Physical Capacities Evaluation form dated September 11, 1995 indicating that you can sit/stand/walk for 6 hours each. Since this information conflicted with Dr. Sakalas, our On-Site Physician spoke with Dr. Miranda. He has declined to make an assessment of your work capacity, however he reported there is no contraindication as to your returning to work.

> We have had your file reviewed by our Vocational Consultants and find that functionally you could perform the duties of your occupation as an Attorney without the use of your left arm. Your occupation is considered sedentary. . . .

> Based on the information we have on your current medical condition and the vocational review, you no longer meet the [Plan's] definition of total disability.

- 5 -

(Id. at 2.)  The Termination Letter stated that if Slupinski did not submit "medical certification within 30 days of the date of this letter" that he continued to meet the Plan's definition of disability, First Unum would deny further liability on his claim. (Id.)

Slupinski telephoned First Unum on December 5, stating--as he had both before and after First Unum's granting of his claim for disability benefits--that he suffered severe pain from his arm injury, which inhibited his ability to perform his daily activities and to work.  Slupinski stated that he was scheduled to have several doctors evaluate his medical condition and that he would submit their evaluations as soon as possible.  Nonetheless, in a letter dated December 29, 1995--28 days after the date of its previous letter which had given Slupinski 30 days to respond-- First Unum informed Slupinski that it "ha[d] completed [its] review of [Slupinski's] UNUM disability claim"; that Slupinski "must be totally disabled any [sic] occupation for [his] benefits to continue"; and that First Unum's "review ha[d] concluded that [First Unum was] unable to continue benefits beyond January 1, 1996."  (Letter from First Unum to Slupinski dated December 29, 1995, at 1.)

Slupinski pursued an administrative appeal of First Unum's termination of benefits.  He pointed out that the specialists he had been seeing were at such medical centers as the Mayo Clinic in Rochester, Minnesota, Harvard Medical School, Mass. General Hospital, LSU Medical Center in New Orleans, and Columbia

Presbyterian Medical Center in New York (see Letter from Slupinski to First Unum dated January 1, 1996, at 1, 3), and he offered to make himself available "to be seen by UNUM physician[s]" (id. at 2). In the ensuing months, Slupinski provided First Unum with the treatment notes and reports from numerous physicians at the various institutions, documenting his severe chronic pain and stating that Slupinski was unable to work because of the pain. (See, e.g., Letter from Dr. David G. Kline, Chairman, Neurosurgery Department at Louisiana State University Medical Center to To Whom It May Concern dated February 21, 1996 (stating that pain "severely paralyzes [Slupinski's] concentration and clear reasoning" and is "severe enough to incapacitate him").) These documents indicated that several doctors had diagnosed Slupinski with, inter alia, causalgia--a persistent and severe burning sensation--in his left arm. (See, e.g., Treatment Notes of Dr. John E. Carey, Mayo Clinic Jacksonville, dated June 7, 1996, at 2 (noting that "the severe burning pain of the entire upper extremity began several weeks after the automobile accident," decreased somewhat over time, but increased for periods of 5-12 months in the wake of each of Slupinski's multiple surgeries undertaken in an effort to "regraft[] the nerve function"); see also id. at 4 (indicating that Slupinski had inquired whether he could free himself of the pain if he had his arm amputated).)

In July 1996, First Unum assigned an in-house physician, Dr. Richard Day, to assess Slupinski's medical condition and work capacity. Prior to making his assessment, Dr. Day did not examine

Slupinski, and he contacted only three of the more than a dozen physicians who had recently treated or examined Slupinski. To those three physicians, Day sent memoranda dated July 30, 1996, setting out his view that those physicians believed Slupinski could work, or would be able to work after January 1, 1997, and requested confirmation of his view. The record is silent as to the response, if any, from the physician whom Day described as stating that Slupinski would be able to work after January 1, 1997; the other two physicians disagreed with Dr. Day's view of their opinions. For example, whereas Day's memorandum to Dr. Charleen Wilson attributed to her the opinion that Slupinski could work but "has chosen not to work" (Memorandum from Dr. Day to Dr. Wilson dated July 30, 1996), Dr. Wilson responded that

> Mr. Slupinski understands that he will not be permanently and totally disabled based upon his injury, and has plans to return to full time work once his surgeries are complete. I feel that it is reasonable that his disability continue until the first of 1997, which will allow him time for corrective surgery if he chooses.

(Letter from Dr. Charleen Wilson to Dr. Richard Day dated August 26, 1996 ("August 1996 Wilson Letter"), at 1.) Wilson stated that, in light of her opinion from February to May 1996 that Slupinski was "permanently impaired and at maximum medical improvement" and in view of Slupinski's planned additional surgeries in the hope of avoiding total and permanent disability, "it would be quite difficult for him" before the beginning of 1997 "to return to any type of work, not only for himself, but for his employer." (Id.)

- 8 -

Dr. Day's memorandum to Dr. Barry Garcia stated that Garcia "felt [Slupinski] will return to work once all the procedures were completed." (Memorandum from Dr. Day to Dr. Garcia dated July 30, 1996.) Dr. Garcia responded:

> I feel that your letter has left out some of the salient points of our conversation. . . .
>
> We discussed at this time I do not feel it is appropriate for him to be working, secondary to the multiple surgical procedures he will be undergoing during the next several months, and the fact that he is on possible mind-altering medications. We also discussed that the patient is in a rapidly changing area of law that requires a significant amount of reading and staying abreast of current events. Because of his numerous surgeries, prolonged recovery, and use of narcotic analgesics and their mind[-]altering effects, he has been unable to stay current, and therefore, perform appropriately in his job. We also discussed at this time that I feel it is appropriate for him to be on Disability . . . .

(Letter from Dr. Barry Garcia to Dr. Richard Day dated August 7, 1996 ("August 1996 Garcia Letter"), at 1-2.)

In a memorandum dated July 30, 1996 (the date on which Dr. Day sent memoranda to Drs. Wilson and Garcia requesting confirmation of his descriptions of their views, and before he received their responses), Dr. Day informed First Unum Senior Benefit Analyst Arthur Hackett that Day's conclusion was that Slupinski was able to work. (See Memorandum from Dr. Day to Arthur Hackett dated July 30, 1996, at 3.) Day opined that Slupinski's only restrictions and limitations "would be based on the functional use of the left upper extremity," and that Slupinski could work as an attorney because that job would "not require heavy lifting." (Id.) In a memorandum to Hackett shortly

thereafter, Dr. Day stated that Slupinski had "sensory abnormalities with the left arm" and "Carpal tunnel syndrome . . . to the right upper extremity"; Day recommended that First Unum consult an "expert in traumatic brain injury." (Memorandum from Dr. Day to Arthur Hackett dated August 15, 1996.) And in a subsequent brief handwritten note, Day stated his "opinion [that Slupinski] has work capacity since January 11, 1996." (Note from Day to Hackett dated November 18, 1996 ("Day November 18 Note to Hackett").)

In a letter dated March 26, 1997, First Unum rejected Slupinski's appeal, notifying him that its decision to deny his claim for further LTD benefits was final ("Final Decision Letter").

B.  The Proceedings in the District Court

On January 28, 1999, Slupinski commenced the present action under ERISA, see 29 U.S.C. § 1132(a)(1)(B), asserting that First Unum's determination that he was no longer disabled was erroneous and seeking judgment ordering First Unum to pay LTD benefits retroactive to January 1, 1996, and prospectively. He also sought, inter alia, prejudgment interest and reasonable attorney's fees. The action lay dormant for some three years, as Slupinski's initial attorney soon withdrew and no new attorney appeared until March 2002. Eventually, First Unum moved for judgment dismissing the complaint on the basis of the

administrative record, and Slupinski cross-moved for summary judgment in his favor.

1. The Decisions in Slupinski I

The district court treated both sides' motions as "motions for a bench trial 'on the papers' as authorized by [Fed. R. Civ. P.] 52," Slupinski I, 2005 WL 2385852, at *5, and denied First Unum's motion and granted that of Slupinski, see id. at *10. Finding that First Unum had not been given special discretionary authority as Plan administrator to determine eligibility for benefits or to construe the terms of the Plan, the court reviewed the administrative record de novo. See id. at *5-*6; see generally Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Kinstler v. First Reliance Standard Life Insurance Co., 181 F.3d 243, 245 (2d Cir. 1999).

The court quickly rejected First Unum's contention that Slupinski's claim of inability to work based on severe pain was a creative afterthought that emerged only after First Unum informed him of the impending termination of his benefits. The court found, based on First Unum internal documents, that Slupinski had informed First Unum that he was unable to work because of pain even before First Unum granted his initial application for LTD benefits, and that prior to the termination he had continued to complain of nerve pain. See Slupinski I, 2005 WL 2385852, at *2; see also id. at *7.

The district court also rejected First Unum's contention that there was insufficient objective evidence to support Slupinski's claim of disabling pain. Noting that assessments of claims of pain depend heavily on whether the claimant had a "verifiable physical injury to which [his] pain may reasonably be attributed," id. at *6, and whether the "claimant's complaints of pain [were] accepted and confirmed by physicians who have examined him," id. at *7, the court found that

> [i]n the present case, each of these two factors, as well as the large volume of other evidence in the record, <u>overwhelmingly</u> supports plaintiff's claim that <u>his severe and chronic pain prevents him from engaging in "any gainful occupation for which he is reasonably fitted</u>,"

id. (emphases added). The court found that

> [f]irst, plaintiff's complaints of pain relate to a serious and objectively proven injury, namely the severe nerve damage to plaintiff's left arm. It is undisputed that plaintiff suffered severe and objectively determined nerve damage leaving him with serious functional limitations. Thus, there is an objective component to his injury that tends to lend greater credibility to his complaints of pain. <u>Plaintiff's doctors have . . . consistently and uniformly stated that these objective physical injuries can and do explain his severe pain</u>.
>
> Second, the doctors['] reports contained in the administrative record consistently confirm plaintiff's repeated statements that he is unable to work due to his constant pain. <u>Most persuasive are the letters by [Drs.] Kline and Lovelace, each of whom examined plaintiff in December 1995 and found him unable to return to work</u>. With one or two questionable exceptions, each of the many doctors who evaluated plaintiff found his complaints of pain to be credible in light of the physical injuries he sustained. Aside from Kline and Lovelace, <u>plaintiff's inability to return to work due to pain was documented by Doctors Carey, Cheshire, Shiavitz, Daube, Zuniga, and Link</u>. The consistency and uniformity with which the doctors who have evaluated

> plaintiff concur strongly support plaintiff's claims that his pain prevents him from returning to work.

Id. (emphases added).

As to the "questionable exceptions" to the otherwise "uniform[]" view that Slupinski's constant pain prevented him from working, id., the court found that First Unum's determination that Slupinski was no longer disabled was based on statements of three doctors, none of which the court found credible, see id. at *8. The first such statement was the September 1995 PCE form filled out by Dr. Sakalas, on which he checked boxes indicating that Slupinski could work. But "Sakalas had not seen [Slupinski] since January 12, 1995 at which time he stated that [Slupinski] was prevent[ed] from gainful employment," id. (internal quotation marks omitted); First Unum did not point to anything in the record that justified Dr. Sakalas's change of view. The second "questionable" statement was the September 1995 PCE form received from Dr. Miranda, which made "numerous contradictory and equivocal statements." Id.; see id. at *2 (describing the boxes checked on that PCE form indicating that Slupinski "was unable to work even part time," but that he "could sit, stand, and walk for six hours with rests and, in what is clearly factually incorrect, that [Slupinski] had 'functional capacity in both hands'" (quoting form)). After reading the PCE form received from Miranda, Dr. Sharon H. Hogan, a First Unum in-house physician, had contacted Dr. Miranda to discuss the functional-capacity-in-both-hands evaluation and other inconsistencies in his statements. Hogan summarized their telephone conversation in a follow-up letter to

- 13 -

Miranda stating, inter alia, "You could not find a copy of the PCE Form in Mr. Slupinski's chart, but you suspect that your nurse completed it." (Letter from Dr. Sharon Hogan to Dr. Fernando Miranda dated October 18, 1995 ("Hogan Letter").) The court found that the Sakalas and Miranda PCE form indications that Slupinski could work were not credible.

The court also concluded that "even if" the "questionable statements" on the Sakalas and Miranda PCE forms "were credible they could not possibly outweigh the numerous other medical opinions confirming plaintiff's pain and inability to work." Slupinski I, 2005 WL 2385852, at *8.

The third doctor on whom First Unum relied was its in-house physician Dr. Day, who, the district court noted, "never physically examined [Slupinski]" and "contacted only very few of the many physicians [who] had treated [Slupinski]," id. at *4. The court found that "Day's report, too, provides little support for First Unum's position." Id. at *8. Rather, the report described the notes of at least five physicians, over a two-year period, which stated that Slupinski suffered a "fairly severe" burning feeling in the hand, or "causalgia," or "pain of the entire hand, and distal forearm dorsal," or "memory and concentration problems." Id. The court stated that

> [s]omehow, despite this overwhelming evidence of plaintiff's painful condition, Day managed to conclude that plaintiff "has work capacity." Day's failure to credit plaintiff's complaints of pain and the "many letters from multiple neurologists, physiatrists, and neurosurgeons" that he reviewed, undermines the significance and credibility of his report. When evaluated side by side with the

- 14 -

> **overwhelming evidence of plaintiff's pain and consequent inability to return to work, the report is of little value**.

*Id*. (emphases added). *See* Merriam-Webster's Collegiate Dictionary (11th ed. 2008) (defining "physiatrist" as a physician who specializes in physical medicine and rehabilitation).

Accordingly, the district court concluded that First Unum's termination of Slupinski's LTD benefits was improper.

Despite ruling in favor of Slupinski on the merits, the district court concluded that he was not entitled to an award of attorney's fees. The court noted the five *Chambless* factors, *see Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987) ("*Chambless*"), that this Court has adopted to guide the determination of whether to award fees in connection with a claim under ERISA, *i.e.*, (1) the degree of the offending party's culpability or bad faith, (2) that party's ability to satisfy a fee award, (3) the likely effect of the fee award to deter others from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) the conferral *vel non* of a common benefit on a group of pension plan participants. *See Slupinski I*, 2005 WL 2385852, at \*9. The court concluded that "the lack of bad faith and absence of a common benefit conferred upon a group of pension plan participants counsel[] against an award of attorney's fees in this case." *Id*. at \*10.

The court also denied Slupinski's request for prejudgment interest. It noted that in deciding whether to exercise its

- 15 -

discretion to award such interest, a court is to consider "'(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.'" Id. at *9 (quoting Jones v. UNUM Life Insurance Co. of America, 223 F.3d 130, 139 (2d Cir. 2000) ("Jones v. UNUM")). The court concluded that the interests of fairness did not require such an award because Slupinski had failed to commence the action until nearly two years after First Unum terminated his benefits and had failed to take any action for another three years after bringing suit. Slupinski I, 2005 WL 2385852, at *9.

Judgment was entered on September 30, 2005. First Unum did not appeal. Slupinski appealed, contending that the judgment did not clearly award him benefits for the entire period to which he was entitled to them and that the district court erred in denying him attorney's fees and prejudgment interest. The appeal was withdrawn without prejudice, and Slupinski moved in the district court for, inter alia, clarification of the judgment.

2. The Decisions in Slupinski II

Following the entry of judgment, First Unum took the position that it was required to pay Slupinski LTD benefits only for the period from January 1996, when it ceased payments, through March 26, 1997, when the administrative record closed. Slupinski

- 16 -

moved for clarification that the judgment entitled him to full retroactive payment of past benefits through the date of the judgment, as well as reinstatement of his LTD benefits prospectively.

In an opinion dated August 4, 2006, and docketed as of August 7, 2006, see Slupinski v. First Unum Life Insurance Co., No. 99 Civ. 0616, 2006 WL 2266569 (S.D.N.Y. Aug. 7, 2006) ("Slupinski II"), the district court granted Slupinski's motion for clarification. The court found that First Unum's view of its adjudicated obligations was contrary to both the court's intent and the "plain meaning" of Slupinski I. Slupinski II, 2006 WL 2266569, at *2. It ruled that the judgment required First Unum to pay "full retroactive benefits through the present and prospective benefits until such time as First Unum determines that plaintiff is no longer disabled." Id.

Slupinski also moved for reconsideration of the denial of his request for attorney's fees. The district court denied this motion. Although expanding somewhat on its discussion of the five Chambless factors and finding that three of those factors, to varying degrees, favored Slupinski, the court adhered to its view that "[t]he important factors of culpability and common benefit not being met, an award of attorney's fees would be inappropriate." Slupinski II, 2006 WL 2266569, at *4-*5.

Slupinski appealed from so much of Slupinski II as denied reconsideration of his request for attorney's fees. His original

appeal was reinstated, and the two have been consolidated. First Unum has not appealed from the order clarifying its obligations.

II. DISCUSSION

A. Attorney's Fees

On appeal, Slupinski argues principally that the district court erred in denying attorney's fees based on lack of culpability on the part of First Unum and lack of a common benefit to Plan participants; he argues that all five Chambless factors weigh in his favor and that an award of attorney's fees was thus required as a matter of law. Alternatively, he argues that we should hold that an award of fees was required as a matter of law even if only the first four factors weigh in his favor. First Unum, while disputing some of the court's findings that favored Slupinski, argues that the district court's ultimate ruling on fees was correct. For the reasons that follow, we conclude that the district court's view of First Unum's rejection of Slupinski's claim of continued disabling pain as "not constitut[ing] culpability sufficient to warrant an award of attorney's fees," Slupinski II, 2006 WL 2266569, at *5, is not supported by the record and that Slupinski is entitled to an award of attorney's fees notwithstanding the absence of a common benefit to Plan participants.

The central purpose of ERISA is to protect beneficiaries of employee benefit plans, see, e.g., 29 U.S.C. § 1001(b);

- 18 -

_Salovaara v. Eckert_, 222 F.3d 19, 31 (2d Cir. 2000), and "private actions by beneficiaries seeking in good faith to secure their rights under employee benefit plans are important mechanisms for furthering ERISA's remedial purpose," _id_. at 28 (internal quotation marks omitted). With exceptions not pertinent here, the statute provides that the court in an ERISA action "in its discretion may allow a reasonable attorney's fee and costs of action to either party," 29 U.S.C. § 1132(g)(1). Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights. See, e.g., _Seitzman v. Sun Life Assurance Co. of Canada, Inc._, 311 F.3d 477, 486 (2d Cir. 2002) ("_Seitzman_").

In this Circuit, as the district court recognized, the decision whether to award such a fee is ordinarily based on the five _Chambless_ factors, to wit:

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

_Chambless_, 815 F.2d at 871. "ERISA's attorney's fee provisions must be liberally construed to protect the statutory purpose of vindicating" employee benefits rights, e.g., _id_. at 872 (dealing with retirement benefits); _Locher v. UNUM Life Insurance Co. of America_, 389 F.3d 288, 298 (2d Cir. 2004) ("_Locher v. UNUM_") (dealing with long-term disability benefits), and a "failure to satisfy the fifth _Chambless_ factor does not preclude an award of

- 19 -

attorneys' fees," id. at 299; see, e.g., Mendez v. Teachers Insurance & Annuity Ass'n & College Retirement Equities Fund, 982 F.2d 783, 789 (2d Cir. 1992); Ford v. New York Central Teamsters Pension Fund, 642 F.2d 664, 665 (2d Cir. 1981).

We review the district court's decision to grant or deny attorney's fees for abuse of discretion. See, e.g., Paese v. Hartford Life & Accident Insurance Co., 449 F.3d 435, 450 (2d Cir. 2006) ("Paese"); Jones v. UNUM, 223 F.3d at 138. A court abuses its discretion "when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision--though not necessarily the product of a legal error or a clearly erroneous factual finding--cannot be located within the range of permissible decisions." Zervos v. Verizon New York, Inc., 252 F.3d 163, 169 (2d Cir. 2001) (footnote omitted).

In the present case, we have no difficulty with the district court's assessment in Slupinski II of the second, third, and fifth Chambless factors. The court found that "[t]he second and third factors," i.e., First Unum's ability to pay and the likelihood that an award of fees would have a deterrent effect,

> favor Slupinski because First Unum does not deny the ability to pay an award of attorney's fees and because such an award will likely deter First Unum and other administrators from denying claims for disability benefits based upon pain.

2006 WL 2266569, at *5. First Unum presents no persuasive argument for overturning these findings. We also are not persuaded by the contention of Slupinski that the district court

- 20 -

erred in finding that the fifth factor, i.e., whether the lawsuit conferred a common benefit on a group of Plan participants, rather than a benefit solely to Slupinski, favored First Unum. Slupinski has not pointed to any common benefit beyond the deterrent effect that is taken into account in the third Chambless factor.

We do, however, have considerable difficulty with the district court's rulings on the first and fourth Chambless factors, i.e., the degree of culpability--or of bad faith, if any--on the part of First Unum and the relative merits of the parties' positions. And while the degree of culpability and the relative merits "are not dispositive under the [Chambless] five-factor test," they do "weigh heavily." Anita Foundations, Inc. v. ILGWU National Retirement Fund, 902 F.2d 185, 189 (2d Cir. 1990) ("Anita").

As to the first Chambless factor, we note that "'culpability' and 'bad faith' are distinct standards." Paese, 449 F.3d at 450. Thus, to win an award of attorney's fees under ERISA a party need not prove that the offending party acted in bad faith. See, e.g., id. at 450-51; Locher v. UNUM, 389 F.3d at 299.

"'[C]ulpable conduct is commonly understood to mean conduct that is "blameable; censurable; . . . at fault; involving the breach of a legal duty or the commission of a fault . . . ."'" Id. (quoting McPherson v. Employees' Pension Plan of American Re-Insurance Co., Inc., 33 F.3d 253, 256-57 (3d Cir. 1994) (quoting Black's Law Dictionary (6th ed. 1990))). For example, without consideration of whether a plan administrator's denial of a

meritorious disability benefits claim was an act in bad faith, the administrator may properly be found culpable if it "failed to engage in a fair and open-minded consideration of [the] claim." Paese, 449 F.3d at 451 (internal quotation marks omitted). Similarly, we have held that when an ERISA plan administrator denies a meritorious disability benefits claim on the basis of findings by its in-house physician, who did not base his findings on scientific analysis of the medical evidence and who

> rejected medical conclusions without properly following up with the evaluators, [without] seeking independent evaluations from persons with comparable qualifications, [and without] examining [the claimant] himself when troubled by the perceived inconsistencies between the medical office files and documents submitted in support of the benefit application,

Locher v. UNUM, 389 F.3d at 298-99, the administrator is properly found to be "culpable" within the meaning of the first Chambless factor, id.; see also Salovaara v. Eckert, 222 F.3d at 28 (suggesting that any defendant found to have "violated ERISA, thereby depriving plaintiffs of rights under a[n employee benefit] plan and violating a Congressional mandate" is "culpable" within the meaning of the first Chambless factor (internal quotation marks omitted)). The first-factor question for the district court is the "degree" of the defendant's culpability. Chambless, 815 F.2d at 871.

The degree-of-culpability and relative-merits factors are closely related. Indeed, we have found it useful in some circumstances to consider them together, see, e.g., Anita, 902

F.2d at 189; Seitzman, 311 F.3d at 483, and we find those factors intertwined here.

The district court in Slupinski II, in elaborating on why it concluded that First Unum's refusal to continue paying Slupinski disability benefits was not sufficiently culpable to weigh in favor of an award of attorney's fees to Slupinski, stated rationales that we conclude either reflected erroneous legal standards or were contrary to findings that the court had made in ruling in Slupinski's favor on the merits in Slupinski I, which First Unum did not appeal. First, in Slupinski II, the district court found that "First Unum's denial was not without any basis" because Dr. Sakalas had submitted a report stating that Slupinski could work full time, and "[Dr.] Miranda[] had equivocated on [Slupinski's] functional capacity." 2006 WL 2266569, at *5. But these were statements in September 1995 PCE forms that the court had found were "not . . . credible," Slupinski I, 2005 WL 2385852, at *8. For example, Dr. Sakalas had opined in January 1995 that Slupinski was "prevent[ed] from gainful employment," id. (internal quotation marks omitted) (emphasis added), and "First Unum d[id] not dispute" that Sakalas had not seen Slupinski again before making the contrary PCE form statement in September 1995--on which First Unum relied--that Slupinski could work, id. Not having seen Slupinski since January when in Sakalas's opinion Slupinski was disabled, Sakalas had no apparent basis for stating in September 1995 that Slupinski could work.

- 23 -

Moreover, the PCE form received from Dr. Miranda in September 1995 was incredible on its face, as it stated that Slupinski had "functional capacity in both hands," id. at *2 (internal quotation marks omitted), a statement that the court noted was "clearly factually incorrect," id. Indeed, we note that this had impelled First Unum's Dr. Hogan to make inquiry of Dr. Miranda by telephone, whereupon First Unum learned that the PCE form had probably been filled out not by Dr. Miranda but by his nurse (see Hogan Letter). Despite this information, First Unum, in both its Termination Letter and its Final Decision Letter, described Dr. Miranda as having stated in the PCE form that Slupinski could work. In addition, even assuming that the PCE form had been filled out by Dr. Miranda, First Unum's use of that form was unreasonably selective. Disregarding the clearly incorrect statement that Slupinski had full use of his left arm, First Unum relied on boxes that were checked to say that Slupinski could sit/stand/walk for six hours each. But it refused to credit the checked boxes that said Slupinski could not work full time or even part time. Given that a person's ability to sit/stand/walk for a given period says nothing about his ability to concentrate, and given the uniform and consistent view of Slupinski's doctors that his pain was disabling because it prevented him from concentrating, First Unum could not reasonably rely on the sit/stand/walk evaluation to override the explicit statement that Slupinski was unable to work.

We note that in discussing First Unum's culpability in Slupinski II, the district court did not state that First Unum's reliance on the PCE reports of Drs. Sakalas and Miranda was reasonable. It merely stated that, in light of those reports, First Unum's decision was not without "any" basis. Slupinski II, 2006 WL 2266569, at *5. To the extent that the court meant to imply that a plan administrator's conduct is not sufficiently culpable to weigh in favor of an award of attorney's fees even if its decision rests on a basis that is not reasonable, that conclusion would constitute an error of law. To the extent that the district court instead meant to imply that First Unum's termination of Slupinski's disability benefits on the basis of the PCE reports from Drs. Sakalas and Miranda was reasonable, that finding is contradicted by the court's observation in Slupinski II that the medical evidence contrary to those reports was "voluminous," id., and by its findings in Slupinski I that those PCE reports were not credible and, "even if these two questionable statements [by Dr. Sakalas and, probably, Dr. Miranda's nurse] were credible they could not possibly outweigh the numerous other medical opinions confirming [Slupinski's] pain and inability to work," 2005 WL 2385852, at *8 (emphasis added).

These findings--(a) that the reports relied on by First Unum were not credible and (b) that those reports, even if they had been credible, "could not possibly outweigh" the numerous other medical opinions confirming Slupinski's disabling pain--also reveal the flaw in the district court's finding in Slupinski II

- 25 -

that the fourth Chambless factor, the relative merits of the parties' positions, did "not [weigh] overwhelmingly" in Slupinski's favor, 2006 WL 2266569, at *5. In the section of Slupinski I devoted to the merits, the district court stated that Slupinski's "objectively verifiable physical injury to which [his] pain may reasonably be attributed" and the fact that his "complaints of pain [had been] accepted and confirmed by physicians who ha[d] examined him," along with "the large volume of other evidence in the record, overwhelmingly supports plaintiff's claim that his severe and chronic pain prevents him from engaging in 'any gainful occupation for which he is reasonably fitted.'" 2005 WL 2385852, at *6-*7 (quoting the Plan) (emphasis ours). Further, after describing the reports of a number of Slupinski's treating physicians, the district court stated that Dr. Day, in July 1996, "[s]omehow . . . managed to conclude" that Slupinski could work despite the "overwhelming evidence of plaintiff's painful condition." Id. at *8 (emphasis added). The court found that Dr. Day's opinion, on which First Unum relied in rejecting Slupinski's appeal from the decision to terminate his benefits, was "of little value" "[w]hen evaluated side by side with the overwhelming evidence of plaintiff's pain and consequent inability to return to work." Id. (emphasis added). In light of its findings on the merits that Slupinski's proof of his continuing disability was "overwhelming" and that the reports on which First Unum relied had "little value" or were "not . . . credible," the court's finding in Slupinski II that the

relative-merits factor did not overwhelmingly favor Slupinski was clearly erroneous and beyond the range of permissible decisions.

We note that, in finding that the relative-merits factor did not favor Slupinski "overwhelmingly," the district court stated in Slupinski II that First Unum's position was "not . . . frivolous." 2006 WL 2266569, at *5. But the frivolousness standard is more pertinent to a fee award that is meant as a sanction than to an award to a plan participant who has prevailed on his claim under ERISA, whose provision for awards of attorney's fees is designed to be remedial. The position taken by a defendant in violation of ERISA need not descend to the level of frivolity in order to be sufficiently culpable to weigh in favor of awarding fees to the ERISA claimant.

In addition to the fact that as a matter of substance the evidence in Slupinski's favor was overwhelming, our view of the degree of First Unum's culpability is influenced by certain aspects of the administrative record that reveal that First Unum's procedures were less than reasonable. For example, as noted by the district court, when Dr. Day was assigned the responsibility of assessing Slupinski's physical limitations and his ability to return to work, he "contacted only very few of the many physicians [who] had treated [Slupinski]." Slupinski I, 2005 WL 2385852, at *4. And although one of the physicians whom Dr. Day did contact recommended that Day himself should examine Slupinski (see August 1996 Garcia Letter at 2), neither Day nor any other First Unum physician sought to examine or contact Slupinski.

Further, as indicated in Part I.A. above, with respect to the three physicians whom Dr. Day did contact in July 1996, Day misdescribed the opinions of at least two. For example, Dr. Garcia, who had unsuccessfully urged Dr. Day to examine Slupinski, responded that Day's memorandum to Garcia "left out some of the salient points of our conversation," including "discuss[ion]" that Dr. Garcia "d[id] not feel it . . . appropriate for [Slupinski] to be working" and discussion that "at this time" Garcia "fe[lt] it [was] appropriate for [Slupinski] to be on Disability." (August 1996 Garcia Letter at 1-2.) Dr. Garcia referred in particular to the fact that Slupinski was being treated with "possible mind-altering medications" and that the "use of narcotic analgesics and their mind[-]altering effects" would not allow Slupinski to work appropriately. (Id.)

In October 1996, Hackett asked Dr. Day to review the additional information that First Unum had received since Day's July review and inquired, "What is the consensus of opinion among his multit[u]de of treating physicians as to his capacity? Please comment on this specifically as there does not appear to be agreement." (Hackett Memorandum to Dr. Day dated October 30, 1996 ("Hackett Memorandum") (emphasis added).) Hackett also noted that Slupinski "is taking a lot of medication. Please comment on how this will impact on his ability to concentrate as I would expect that [a] high level of functioning is necessary to perform his occ[upation] or a gainful occ[upation]." (Id. (emphasis added).) Dr. Day's response, in toto, was as follows:

- 28 -

> I have reviewed the file, and spoken w/ Dr. Podrizki. From my review my opinion is the claimant has work capacity since January 11, 1996. It was not until the tissue expanders were placed that according to the file information the pain from the tissue expanders was intolerable. Dr. Wilson noted this is the final procedure which would be reasonable.
>
> Dr. Podrizki notes after reconstructive surgery the claimant will have work capacity, but will need assistance to get there.

(Day November 18 Note to Hackett; see generally Treatment Notes of Dr. John B. Harris, Mayo Clinic Jacksonville, dated June 26, 1996 (referring to impending surgery to implant tissue expanders into Slupinski's left shoulder muscle in an effort to close extensive scar tissue at the site of a prior skin graft).) Both the contents and the brevity of Day's response to Hackett's inquiry are remarkable. Day's conclusion that Slupinski had been able to work "since January 11, 1996," squarely contradicted, inter alia, Dr. Wilson's opinion that Slupinski had been totally disabled at least from February 1996, when Dr. Wilson first saw him, until May 1996 and that Slupinski's disability should reasonably continue until January 1, 1997. (See August 1996 Wilson Letter at 1.) Nor was Day's conclusion that Slupinski had been able to work since January 1996 supported by the record as to Dr. Podrizki. That doctor had seen Slupinski only once (see Letter from Dr. Richard Day to Dr. Serge Podrizki dated November 8, 1996), and that was in August 1996. And in his November 18 note, Day made no response whatever to Hackett's request for a description of the "consensus" among Slupinski's "multit[u]de of treating physicians" (Hackett Memorandum) or to Hackett's inquiry as to the effect of

- 29 -

Slupinski's medication on his ability to concentrate. First Unum's reliance on Dr. Day's conclusion as to Slupinski's work capacity, which followed his partial investigation and incomplete responses, could not be termed reasonable.

Moreover, First Unum proceeded to mischaracterize Dr. Day's response to so much of the Hackett Memorandum as requested information relating to Slupinski's pain, by giving an incomplete description of Day's view. In its Final Decision Letter, First Unum stated that "Dr. Day note[d] that it was not until the tissue expanders were placed on June 26, 1996 that Mr. Slupinski's pain became intolerable." (Final Decision Letter at 2 (emphasis added).) As revealed above, however, what Day actually said was that "[i]t was not until the tissue expanders were placed that according to the file information the pain from the tissue expanders was intolerable." (Day November 18 Note to Hackett (emphasis added).)

This was not the first time First Unum had omitted material language from its descriptions of reports of in-house experts on which it relied to explain the termination of disability benefit payments to Slupinski. In the December 1, 1995 Termination Letter, First Unum stated that its vocational expert had reported that Slupinski "could perform the duties of [his] occupation as an Attorney without the use of [his] left arm." (First Unum Termination Letter at 2.) The November 21, 1995 report of the vocational expert, however, stated that Slupinski could perform manual functions with his right hand, his dominant

hand, and could function as an attorney "[u]nless issues exist to impair or diminish cognitive attention and focus." ("Voc. Review" at 2 (emphasis added).) First Unum omitted mention of the vocational expert's caveat for the possibility of disabling pain.

And along similar lines, First Unum's Termination Letter to Slupinski stated that Dr. Miranda in conversation with First Unum's in-house physician--a reference to the October 18, 1995 conversation described in the Hogan Letter--had "reported there is no contraindication as to your returning to work." (First Unum Termination Letter at 2.) What the Hogan Letter actually said, however, was that Dr. Miranda had stated "there would be no medical contraindication to [Slupinski's] returning to work if he specifically asked to do so" (Hogan Letter (emphasis added)). As qualified by the if-he-specifically-asked-to-do-so clause, the view that Slupinski could return to work was entirely consistent with the medical opinions that Slupinski suffered disabling pain: presumably if Slupinski asked to go back to work it would mean that his pain had abated to such an extent that it no longer interfered with his ability to concentrate. Indeed, Dr. Hogan's notes with respect to that conversation reveal that that was the meaning of that clause. They stated that Slupinski "has mild [left upper extremity] reflex sympathetic distrophy [sic]" (one characteristic symptom of which is burning pain) "which could impact work cap[ability]" (Handwritten notes of Dr. Hogan dated October 18, 1995), and that when she spoke with Dr. Miranda on October 18, 1995, limitations based on pain "remained in question

- 31 -

in [Dr. Miranda's] mind" (Medical Review by Dr. Hogan dated March 8, 1996). The Termination Letter's omission of the Hogan Letter's if-Slupinski-asked-to-work clause materially changed the view that Dr. Hogan reported Dr. Miranda had expressed.

In that October 1995 conversation with Dr. Hogan, Dr. Miranda also said he wanted to "defer making an assessment of [Slupinski's] work capacity." (Hogan Letter.) In February 1996, Dr. Miranda sent a letter stating that Slupinski remained unable to work. First Unum refused to credit this letter, stating that its "credibility" was "limited" because Miranda had not seen Slupinski since August 1995. (Final Decision Letter at 2.) This rationale is noteworthy because, in contrast, First Unum chose to credit the September 1995 PCE form filled out by Dr. Sakalas stating that Slupinski could work, despite the fact that Dr. Sakalas had not seen Slupinski since January 1995, when Sakalas's opinion was that he could not work. These inconsistent treatments of the opinions of Drs. Sakalas and Miranda, in such similar circumstances, give First Unum's decision an appearance of arbitrariness and self-service, rather than the fair and open-minded consideration of Slupinski's claim that ERISA required.

In sum, First Unum terminated Slupinski's disability benefits on the basis of two reports that the court found were not credible, and even if credible could not possibly outweigh the numerous other medical opinions that consistently and uniformly confirmed his continued disability. First Unum then refused to reinstate those benefits on the basis of the recommendations of

its in-house physician Dr. Day, who (a) although urged to, had not examined Slupinski himself, (b) had contacted only three of Slupinski's more than 12 treating or examining physicians before reporting that Slupinski could work, (c) had misdescribed the opinions of at least two of the three physicians he did contact, and (d) gave a bottom-line opinion that Slupinski could work as an attorney because there was no heavy lifting, an opinion that gave no apparent recognition either to an attorney's need to be able to concentrate or to the concept that pain could interfere with concentration. And First Unum, in its Termination Letter and Final Decision Letter to Slupinski, made statements that described three of its own experts' reports incompletely, omitting parts that were pertinent to Slupinski's claim that the continuing pain from his injuries impeded the concentration necessary for him to perform as an attorney. We conclude that the district court's findings (a) that there was not a serious disparity between the merits of the parties' respective positions, and (b) that First Unum's conduct in these circumstances did not evince sufficient culpability to weigh in favor of an award of attorney's fees to Slupinski, were not within the range of permissible decisions.

Finally, we note our disagreement with the district court's suggestion that the denial of fees to Slupinski was warranted by the fact that "First Unum paid benefits for more than three years before it finally determined that Slupinski was no longer eligible." Slupinski II, 2006 WL 2266569, at *5. The fact that First Unum fulfilled its ERISA obligations for a while did

not make it less culpable for changing course and violating ERISA by ceasing to pay Slupinski disability benefits in the face of "voluminous" and "overwhelming" evidence that he continued to be disabled.

B.  Prejudgment Interest

Slupinski also contends that the district court erred in denying prejudgment interest on the basis of the length of the periods between the accrual of his ERISA claim and the commencement of this action and between the filing of suit and his obtaining a replacement attorney.  We agree.

We have interpreted ERISA as authorizing the district court to award prejudgment interest to a successful ERISA claimant, and that decision, like the decision to award attorney's fees, is committed to the sound discretion of the district court. See, e.g., Jones v. UNUM, 223 F.3d at 139.  Like an award of attorney's fees for a successful ERISA claim by an employee benefit plan participant, "prejudgment interest is 'an element of [the plaintiff's] complete compensation.'" Id. (quoting Osterneck v. Ernst & Whinney, 489 U.S. 169, 175 (1989)) (other internal quotation marks omitted).  As the Supreme Court has explained, "a monetary award does not fully compensate for an injury unless it includes an interest component." Kansas v. Colorado, 533 U.S. 1, 10 (2001) (emphases added); see also, e.g., City of Milwaukee v. Cement Division, National Gypsum Co., 515 U.S. 189, 195 (1995)

("The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss."). Thus, in employment-related cases, "we have consistently stated that '[t]o the extent . . . that the damages awarded to the plaintiff represent compensation for lost wages, it is ordinarily an abuse of discretion <u>not</u> to include pre-judgment interest.'" <u>Sharkey v. Lasmo (AUL Ltd.)</u>, 214 F.3d 371, 375 (2d Cir. 2000) (quoting <u>Gierlinger v. Gleason</u>, 160 F.3d 858, 873 (2d Cir. 1998) (emphasis in <u>Gierlinger</u>)); <u>see generally</u> <u>Donovan v. Sovereign Securities, Ltd.</u>, 726 F.2d 55, 58 (2d Cir. 1984).

In addition, an award of prejudgment interest may be needed in order to ensure that the defendant not enjoy a windfall as a result of its wrongdoing. <u>See</u>, <u>e.g.</u>, <u>Skretvedt v. E.I. DuPont De Nemours</u>, 372 F.3d 193, 206 (3d Cir. 2004) (it "is undisputed that prejudgment interest typically is granted to make a plaintiff whole because the defendant may wrongly benefit from use of plaintiff's money" (internal quotation marks omitted)); <u>Algie v. RCA Global Communications, Inc.</u>, 891 F. Supp. 875, 899 (S.D.N.Y. 1994) ("<u>Algie I</u>") ("an award [of prejudgment interest] is particularly appropriate as a means of ensuring that plaintiffs are made whole and that <u>defendants do not profit by their failure to comply with their ERISA obligations</u>" (emphasis added)), <u>aff'd</u>, 60 F.3d 956, 960 (2d Cir. 1995) ("<u>Algie II</u>") (affirming, and adopting the reasoning of <u>Algie I</u>); <u>see generally</u> <u>Donovan v. Sovereign Securities, Ltd.</u>, 726 F.2d at 58 ("Failure to award interest would create an incentive to violate [federal law],

because violators in effect would enjoy an interest-free loan for as long as they could delay paying out . . . .").

There may be circumstances in which an award of prejudgment interest should not be made, such as where the funds at issue have been placed in an interest-bearing account and the judgment orders that the entire account be paid to the plaintiff, see, e.g., Mendez v. Teachers Insurance & Annuity Association & College Retirement Equities Fund, 982 F.2d at 790, or where the funds have been deposited with the court and the plaintiff could have, but did not, seek a court order requiring that they be held in an interest-bearing account, see id. And if the record revealed that the plaintiff had engaged in tactics that were dilatory, i.e., "for the purpose of gaining time or deferring decision or action," Oxford English Dictionary (2d ed. 1989), with the hope of obtaining an award of court-ordered interest at a rate higher than he could obtain in the financial marketplace, the court would plainly have discretion either to deny interest for the specific years of delay attributable to the plaintiff's dilatory tactics, see, e.g., Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 145 (2d Cir. 1993), cert. denied, 510 U.S. 1164 (1994), or to deny it altogether, see, e.g., Sands v. Runyon, 28 F.3d 1323, 1328 (2d Cir. 1994), or to set an interest rate that does not result in a windfall to the plaintiff, see, e.g., Jones v. UNUM, 223 F.3d at 139 ("[T]he aim . . . is to make the plaintiffs whole, but not to give them a windfall." (internal quotation marks omitted)).

- 36 -

In light of these considerations, we have generally stated that the factors that the district court is to consider in determining whether to award prejudgment interest are "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Id. (internal quotation marks omitted). In the present case, the district court did not discuss the first and third factors and gave scant attention to the second. All of those factors favored Slupinski.

First, as reflected by its title, i.e., "Long Term Disability Income Plan" (emphasis added), and by its provisions generally linking a Plan participant's disability benefit level to specified percentages of his "basic monthly earnings" (e.g., Plan § I.2.), Weil Gotschal's Plan is designed to alleviate a disabled employee's loss of income. Given the district court's finding that Slupinski was unable to work, he should have been receiving disability benefits throughout the period of his inability to earn his income. By the time judgment was entered in this case in September 2005, Slupinski had been unable to work for nearly 10 years after First Unum ceased paying him disability benefits. In light of ERISA's purpose of protecting employees' rights to receive the benefits they are due, both the first and third factors, i.e., the need to fully compensate the wronged party for

actual damages suffered and the remedial purpose of ERISA, plainly favored Slupinski.

The second factor, considerations of fairness and the relative equities of the award, also favored Slupinski in light of the fact that the evidence of his continued disability was overwhelming. Yet First Unum refused to continue to pay him, basing its refusal on medical statements that were not credible, in-house investigations and reports that were incomplete, and proffered explanations that were half-truths. As a result, First Unum unfairly had the use of the money that it should have paid to Slupinski during that nearly 10-year period.

The district court denied prejudgment interest to Slupinski solely on the ground that he had not brought suit until nearly two years after First Unum's decision denying his administrative appeal and that, after commencing suit and seeing his first attorney withdraw a few months thereafter, Slupinski did not obtain new counsel for nearly three years. The court did not find that Slupinski sought any advantage, monetary or otherwise, from these delays, and the record does not suggest that he had such a purpose. Given the absence of any such evidence and given the fact that Slupinski commenced his action more than four years before the end of the statute-of-limitations period for ERISA claims, see, e.g., Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan, 698 F.2d 593, 598 (2d Cir. 1983) (the judicially inferred limitations period for ERISA actions in New York State is six years), we

- 38 -

question the propriety of denying prejudgment interest for the period prior to the commencement of suit. Further, as to the period of delay after Slupinski commenced suit, the record gives no indication that First Unum filed a motion to dismiss for failure to prosecute pursuant to Fed. R. Civ. P. 41(b) or ever complained about the delay. Indeed, as discussed above, the delay, allowing First Unum to use the funds so long as there was no judgment, was to First Unum's advantage, because the evidence of Slupinski's continued disability was "overwhelming," Slupinski I, 2005 WL 2385852, at *8. (See also report dated July 29, 1994, of First Unum investigator who had been sent to see Slupinski ("Bottom line, this guy is really in bad shape, you wouldn't believe it, . . . keep paying this guy for life, he deserves the money.").)

In sum, the district court's conclusion that "there has been no showing here of the sort of 'fairness considerations' that would warrant an award of pre-judgment interest," Slupinski I, 2005 WL 2385852, at *9, was clearly erroneous, and the denial of prejudgment interest was an abuse of discretion.

Finally, we note that First Unum has argued on this appeal that Slupinski was in fact able to work during at least part of the period in which his disability benefits were being denied. In support of this argument, First Unum has speculated that Slupinski's first counsel withdrew because of concerns about the legitimacy of Slupinski's claim (see First Unum brief on appeal at 5) and has attempted to argue alleged facts that are not in the

record (see, e.g., id. at 3-4). Facts that are not in the record are not properly brought to our attention, and we do not consider them. See, e.g., Galabya v. New York City Board of Education, 202 F.3d 636, 640 n.1 (2d Cir. 2000). We note that First Unum made a similar attempt in opposing Slupinski's postjudgment motions in the district court, proffering documents that were not in the record. The district court noted that the documents did appear to raise some serious questions as to Slupinski's eligibility for disability benefits under the Plan and stated that "First Unum is, of course, entitled to seek relief in an appropriate post-judgment motion or a new action." Slupinski II, 2006 WL 2266569, at *3. Our review of the district court docket reveals that, in the years since the district court made that suggestion, First Unum has done neither. Its choice instead to persist in proffering evidence that is not in the record, despite being expressly informed of the inappropriateness of such conduct, tends to cast doubt both on the substantive validity of its proffers and on its claim that the equities in this case weigh in its favor.

## CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on these appeals--to the extent that those arguments are properly before us--and have concluded that First Unum's contentions that attorney's fees and prejudgment interest were properly denied are without merit. The

judgment and order of the district court are reversed to the extent that they denied attorney's fees and prejudgment interest, and the matter is remanded for the district court to determine the amounts due Slupinski in each category.

Costs, including a reasonable attorney's fee for this appeal, are awarded to Slupinski; the amounts are to be determined by the district court.